## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Steven Anthony Heller**
721 Fifth Avenue, Apt 30
New York, New York

**Charles William Heller**
c/o the law firm of Zell, Aron & Co.,
34 Ben Yehuda Street Jerusalem,
Israel 9423001

*Plaintiffs*,

*v.*

**The Republic of Hungary**
Budapest, Hungary

*Defendant.*

Civil      Action      No.
_____

**Jury demand for any claims that are triable by jury.**

## COMPLAINT

## I.   <u>INTRODUCTION</u>

1.   Plaintiffs Charles Heller and Steven Heller are United States citizens, brothers and sole legal heirs to the estates of their parents, Gedeon and Elizabeth Heller and grandparents, Joseph and Helena Spitzer.  Both Plaintiffs are more than 80 years old and have been actively pursuing their legal rights in courts for the past decade. Accordingly, they respectfully request that the Court expedite their claim, as further delay can be harmful to Plaintiffs due to their advanced age.

2.   Plaintiffs, their parents and grandparents were all born in Hungary. They had homes, places of businesses and possessions in Budapest and Sopron.

3.   Plaintiffs and their immediate family fled the escalating ferocity of the Holocaust wherein in 1944 over a half a million Jews in Hungary were dispatched to death within a period of less than three months.

4.   Many members of Plaintiffs' extended family were victims of the Holocaust who were brought to death by the inhumane genocide that occurred in Hungary.

5.   Suit is brought against defendant Hungary who was directly responsible for the genocidal taking of all of Plaintiffs' possessions in Hungary.

6.   Defendant orchestrated, collaborated and participated in the confiscation of the personal possessions of all Hungarian Jewish victims, including Plaintiffs. Most, but not all the Defendant's looting of Jewish properties occurred near the end of the war in 1944, when the Nazis and Hungary, knowing that they had lost, raced to complete the eradication of Jews and steal all their property before the Axis surrendered.

7.   In the lexicon of horrors that was World War II, Hungary's eager complicity in the slaughter and plundering of Jews was "probably the greatest and most horrible crime ever

committed in the history of the world." *Simon v Republic of Hungary,* 911 F 3d. 1172, 1190 (D.C. Cir. 2018), quoting Winston Churchill.

8.   Unlike many other sovereign and private perpetrators in the Holocaust, however, Hungary has never been brought before the bar of justice, nor has it been recompense for its wanton thievery, collaboration in murder and genocidal taking violating international law. This suit seeks to remedy those injustices.

## II.   PARTIES

### A. Plaintiffs

9.   Plaintiff Charles William Heller ("Charles") is a citizen of the United States and can be reached c/o the law firm of Zell, Aron & Co., 34 Ben Yehuda Street Jerusalem, Israel 9423001.

10.   Plaintiff Steven Anthony Heller ("Steven") is a citizen of New York domiciled in 721 Fifth Avenue, Apt 30 New York City, New York 10022.

11.   Charles and Steven are the sole heirs of their grandparents Joseph and Helena Spitzer's estate and parents Gedeon and Elizabeth Heller's estate in Hungary. There is no other living issue. For the purposes of this Complaint, we will sometimes refer to Plaintiffs' grandparents as the "Spitzers" and to their parents as the "Hellers." Collectively, we will refer to the entire family as the "Heller Family."

12.   The Spitzers married on November 19, 1895 had one son, George, and one daughter, Elizabeth.

13.   Joseph Spitzer's will allocated his properties in Hungary to be divided between his son George and daughter Elizabeth.

14.   George never married and died on August 21, 1971 without children in New York City. Accordingly, his sister, Elizabeth, and her "issue", *e.g.*, her two sons, Plaintiffs Charles and Steven, are the sole heirs to Joseph Spitzer's estate.

15.   Elizabeth was born in Hungary in 1904.  Elizabeth married Gedeon Heller in Hungary on December 30, 1934.  Elizabeth and Gedeon had two sons: Plaintiffs Charles and Steven. Charles was born on July 13, 1936 in Budapest.  Steven was born on September 1, 1938 in Budapest.

**B.  Defendant Hungary**

16.   The Republic of Hungary is a foreign state as defined in the FSIA, 28 U.S.C. §1602 *et seq*., at Section 1603(a) and is responsible for the theft of Plaintiffs' properties and assets in Hungary.

17.   During World War II, Hungary actively collaborated with Nazi Germany, as a formal ally, in its plan to eradicate European Jewry.  Hungary facilitated the destruction of the vast majority of its own Jewish population at the hands of Germany.

18.   Hungarian officials stripped Jews, including named plaintiffs herein, of their homes, places of business, valuable art, silver, bank accounts and all valuable possessions.  Hungary has never returned those possessions to named plaintiffs.

19.   The Hungarian government insists that the properties mentioned below have been the sole ownership of the government for the past 80 years and they have no legal obligation, in accordance with Hungarian law, to return the properties to the rightful owners.

20.   The Hungarian government continues to benefit from unjust enrichment from the looting of all of Plaintiffs' properties to this very day.

### III.    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1330, 1331, 1332, 1605 and 2201(a). The amount in controversy exceeds five million ($5,000,000.00) dollars exclusive of interest and costs. For more detailed allegations regarding subject matter jurisdiction of this Court under the FSIA, see paragraphs 25-28 below.

22.    This Court has personal jurisdiction under 28 U.S.C. §§1330(b) and 1605(a), and Rule 4(k)(2) of the Federal Rules of Civil Procedure ("FRCP").

23.    Venue lies in this district pursuant to 28 U.S.C. §§1391(d) and (f)(4).

### IV.    DEFENDANT IS NOT IMMUNE FROM SUIT PURSUANT TO 28 U.S.C. §1605(A)(3)

24.    Under 28 U.S.C. §1605(a)(3) of the FSIA, a foreign state shall not be immune from suit in any case:

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in commercial activity in the United States.

25.    This action concerns rights in property, including but not limited to real estate, cash, jewelry, heirlooms, art, valuable collectibles, gold and silver (collectively, the "Properties"), taken by Defendant from their rightful owners and their successors, in violation of international law.

26.    The Properties were taken by Defendant in violation of international law:

(A) The expropriation of the Properties violated international law because it constituted a taking by a state of the property of a non-national and/or stateless individual that: (1) was not for a public purpose; (2) was discriminatory, and (3) was not accompanied with just compensation.   The Hungarian "dejewification" and denationalization process began as early as 1920, continuing through the enactment of three Anti-Jewish Laws in 1938, 1939 and 1941, the issuance of confiscatory and denationalizing decrees from 1942 to 1943 and culminating in 1944 in the ultimate *de facto* abnegation of their citizenship/nationality. That is when Hungary threw its Jewish inhabitants out of their homes, expropriated all of their movable and immovable property, forced them into ghettos, forcibly packed them like animals into cattle cars and shipped them outside the borders of Hungary into the custody and control of another sovereign (Nazi Germany), knowing that these persons would be transported to Auschwitz and other concentration and death camps outside Hungary to be gassed and turned into smoke and ash. Because Hungary stripped its Jews of all indicia of citizenship, the expropriation exception in the FSIA is applicable here.

(B) The expropriation of the Properties also constituted a violation of international customary and treaty law, as evidenced by various sources, including, but not limited to:

  i. The International Covenant on Civil and Political Rights, adopted December 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force March 23, 1976) (ratified by the United States, June 8, 1992);

  ii. Article 8, Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an

International Criminal Court, July 17, 1998, U.N. Doc. A/CONF. 193/9, reprinted in 37 I.L.M. 999 (1998), signed but not ratified by the United States;

iii.   The Charter of the International Military Tribunal, Nuremburg, of August 8, 1945, confirmed by G.A. Res. 3, U. N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946);

iv.   The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N. GAOR, Supp.; No. 18, at 40, U.N. Doc. A/7218 (1968); and

v.   Principles of International Co-operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR, 28th Sess., Supp. No. 30A, U.N. Doc. A/9039/ Add. 1 (1973).

27.   With respect to the requirement of section 1605(a)(3) of the FSIA that the expropriated property be present in the United States, Plaintiffs allege as follows:

(a) The stolen Property or property exchanged for such stolen property is owned and operated by Hungary and other instrumentalities that are engaged in commercial activity in the United States.

(b) Material exchanged for the Property that Defendant stole from the Plaintiffs and their families is or has been present in the United States (*e.g.*, fees and payments, offices, furniture, furnishings, bank accounts, artwork, stock and bond certificates, and securities held in "street name") in connection with commercial activities carried on in the United States by Hungary, including but not limited to:

(i)     The promotion of Hungarian businesses through trading houses, such as the Hungarian National Trading House (MNKH) Cis located in New York;

(ii)    The promotion and advertising of artwork belonging to museums owned by Hungary, such as the Hungarian National Gallery and the Museum of Fine Arts in Budapest, through loans of such artwork to museums in the United States, including the National Gallery of Art in Washington, D.C.;

(iii)   The solicitation in the United States of American tourists through Malev Zrt., the national airline of Hungary and a member of Oneworld ®alliance;

(iv)    Commercial activities and tourism promotion events held at the Hungarian Embassy in Washington, D.C., and at Hungarian Consulate General offices throughout the United States;

(v)     The promotion of American tourism to Hungary through the United States offices of the Hungarian National Tourist Office and Hungarian Tourism Ltd:

(vi)    The promotion of American investment in Hungarian business through the United States offices of the Hungarian Investment Promotion Agency (HIPA);

(vii)   The acquisition by Hungary of military equipment , including but not limited to airplanes, munitions, electronics and armaments from United States companies and suppliers;

(viii)  The use of United States capital and debt markets for investment and to solicit and obtain financing through issuance, since January 2010, of more than $13 billion of U. S. dollar debt securities, including (without limiting the generality of the foregoing): (i) Hungary's establishment in the United States of banking and investment accounts for the issuance of such securities and the periodic payment of

principal and interest thereon, (ii) Hungary's appointment of one or more agents in the United States related thereto, (iii) Hungary's consent to jurisdiction of designated United States Courts for the adjudication of any disputes related thereto, and (iv) Hungary's irrevocable waiver, to the fullest extent permitted by law, of any immunity from jurisdiction to which it might otherwise be entitles in any action which may be instituted by the holder of any such debt security; and

(ix)     The acceptance by Hungary of federal grants, aid and loans from the United States.

## V.     FACTS

### A.  The Spitzers' Pre-Holocaust Properties

28.     Joseph Spitzer, Plaintiffs' grandfather, was an affluent attorney and business entrepreneur who acquired significant assets while residing in Sopron, Hungary.

29.     First and foremost, the Spitzers owned a lucrative real-estate property located on Rakoczi Street, Sopron (the "Rakoczi Property"). These real-estate assets included properties located on what was then known as 35, 36, 37, 38, 39, 40, 41 Rakoczi Street.

30.     This large and lucrative plot of land, described in detail in a deed had several properties with elegant facades in central Sopron, including the Spitzers' home and robust wine business on Rakoczi, which had a very sizable yard. The Rakoczi Property also included an auxiliary building which had several commercial properties on it as well as a sizable yard.

31.     The Rakoczi Property included a second residential house known as Rakoczi 39 ("Rakoczi 39").

32.     The Spitzers owned a third home known as Rakoczi 41.

33.   All these properties have sizable lots with large yards.

34.   In addition to his law practice, Joseph Spitzer was a major wine vintner.  He operated a
      large wine company from his property on Rakoczi Street.  It was a major business with
      multiple employees, wine barrels, wine presses, bottles and other inventory of worth (the
      "Wine Business").

35.   Joseph kept organized records of his assets and properties. To that end, on May 25, 1940,
      Joseph put together a written inventory of his home and business. The inventory list
      included a detailed list of all possessions in the Rakoczi Property.

36.   As for Rakoczi 39, the inventory includes, but is not limited to, the following:

      (a)  ten rooms, multiple safes, an elevator and two servant's quarters;

      (b)  valuable artwork, lavish furniture, expensive silver, jewelry, beds, couches, tables,
           desks, typewriter, radio, cabinets, and expensive interior;

      (c)  Hungarian National Bank and Budapest bank accounts, Sopron Securities and cash
           and securities left in safes;

      (d)  a painting by Van Der Mieris titled "Breakfast" and paintings by Jules Klaber.

      (e)  valuable artwork and furniture in all of its rooms, including valuable oil paintings
           of Venice and self-portraits, a still life and other valuable oil paintings;

      (f)  silver candelabra, china, crystal, silver service;

      (g)  leather furniture, Venetian mirror, violin, expensive tables;

      (h)  a valuable Persian rug;

      (i)  a massive bronze chandelier, buffet, credenza;

      (j)  a table with twelve leather chairs;

      (k)  a grandfather clock from Mathias Selfer Vienna;

(l)  an upholstered sofa and leather covered bolster;

(m) expensive light fixtures and draperies.

37.   As for the Wine Business, the inventory included, but is not limited to, the following:

(a) two large knee-levered pressed from Dengg Vienna;

(b) two electric motor pumps, Bochmann;

(c) four hand-operated pumps from Heizreich;

(d) hoses;

(e) utensils;

(f) distillery extraction apparatuses;

(g) copper vessels;

(h) wooden pallets;

(i) iron wheelbarrows;

(j)  barrel staves;

(k) iron racks;

(l) iron ovens;

(m) lumber and coal supplies;

(n) furniture, tables, shelving, metal straps, boxes with pipettes, tap faucets.

(o) the bottling room had an oak desk and other desks, bookcases, scales, weights, wall screen, charcoal drawing, oil paintings, copy machines, reservoirs, expensive books.

(p) There was also a safe with 800,000 Kronen, bond certificates, lottery tickets, receipts, stamps, cash notes, clothes rack, two chairs in the kitchen and dining room.

(q) Kitchen appliances, dishes, glasses, silver spoons, cutlery, servants quarters with 2 beds, various pieces of furniture, chest with linens, tables, mirrors, credenzas and contents.

## B. **The Hellers' Pre-Holocaust Properties**

38.   Plaintiffs' parents, Gedeon and Elizabeth Heller, lived in Budapest from 1934-1939. They purchased and lived in their home on Tombitas UT 20, Budapest II, Hungary.

39.   Plaintiffs Charles and Steven were born in that home.

40.   The safe in the Hellers' residence including five gold watches, two diamond wedding rings, a pearl necklace, gold tie pin rings and other fine jewelry.

41.   Gedeon bought and owned a business "*Koller Jozsef Es Trasa*" which was the finest retailer in Budapest of men's and women's clothing and custom tailoring. The address of this business was V., Deak Ferrenc- UTCA 4, Budapest, Hungary.

42.   The Hellers' property along with the Spitzers' property as described above will be collectively referred to as the "Properties."

43.   As asserted below, the Properties were stolen by Hungary to further its genocidal prerogative.

## C. **The Hungarian Holocaust**

44.   The Heller Family was spared the genocidal murder that most Hungarian Jews suffered. Had Heller and Spitzer Families remain in Hungary, they would have perished along with **over 440,000 Hungarian Jews who were exterminated between May 15 and July 9, 1944**. During a span of less than three months, these Hungarian Jews were transported, mostly to Auschwitz, in 147 trains where they were exterminated.  There was a daily arrival

of 12,000- 14,000 Hungarian Jews to gas chambers and huge open pits where Jews were mass murdered at a record, horrific speed.

45. The Holocaust consisted of the systematic, bureaucratic, state-sponsored persecution and murder of approximately six million Jews, two-thirds of the pre-World War II European population.  It began in 1933 when the Nazi party rose to power in Germany and ended in 1945 with Germany's defeat by the Allied powers.

46. Almost ten percent of the Jewish victims of the Holocaust were Hungarian-over 550,000 men, women and children.

47. The Nazis called their plan to exterminate the Jewish population of Europe "the Final Solution" by which they meant the organized, bureaucratized and premeditated murder of the Jews, achieved by first isolating them, then expropriating the Jews' property, then ghettoizing them, then deporting them to camps, and finally, murdering the Jews and in many instances cremating their bodies.

48. Hungary was a willful collaborator and participant in the Final Solution, including the isolation and ghettoization of Hungarian Jewry and the systematic plundering of their wealth and possessions, from which Defendant benefitted beginning as early as 1941 with the expulsion of the bulk of Hungarian Jewry from the Carpathian region, and from which the Defendant continues to benefit to this day.

49. Although the German army did not occupy Hungary until March 1944, its Jewish inhabitants were not spared the depredations of the Holocaust before then.  In 1941, over 100,000 Jews who were citizens of Hungary and had been legally residing there before World War II were summarily and wrongfully stripped of their citizenship and residence rights and declared by Defendant Hungary to be stateless aliens.

13

50.    In addition, many refugees fled to Hungary on the heels of the German annexation of Austria, the dismemberment of Czechoslovakia and the German occupation of Poland.

51.    During July and August 1941, Hungarian authorities rounded up native Hungarian Jews, including those who could and could not prove their citizenship and transported approximately 18,000 of them to the Polish border.  Jewish refugees residing in Hungary were also forcibly removed to internment camps established by Defendant Hungary in violation of international law.

52.    A total of approximately 60,000 Hungarian Jews were slaughtered before the German occupation in 1944 as a consequence of the active participation of Defendant Hungary.

53.    The Hungarian government allied with Nazi Germany in 1939.

54.    On November 20, 1940, Hungary joined the Tripartite Pact and enacted anti-Jewish laws allowing for looting and confiscating properties.

55.    On March 19, 1944, Adolf Eichmann and a group of SS officers arrived in Budapest.  Ten days later, anti-Jewish laws were enacted calling for the expropriation of all Jewish property and contents.   Eichmann led the exportation of Hungarian Jews to extermination camps.

56.    From May 15 to July 9, 1944, Hungarian gendarmerie officials, under the guidance of German SS officials, deported around 440,000 Jews from Hungary. Most were deported to Auschwitz-Birkenau, where, upon arrival and after selection, SS functionaries killed the majority of them in gas chambers.

**D.  Hungarian Thefticide**

57.    During the ghettoization phase of the Hungarian Final Solution, Hungarian officials, notably employees of the Hungarian Customs Services and other public officials including

gendarmes and schoolteachers, went from one Jewish home to the next making detailed inventories of the property in the homes from which Jews fled.

58. The property was then checked by agents of the Defendant Hungary against declarations that each Jewish family was forced to prepare for deportation.  Next, the property was expropriated by Defendant Hungary and converted to cash through sales and other means. Proceeds were transferred to the Hungarian government treasury and comingled with Hungarian government revenues.

59. The Hungarian police seized all Jewish properties, including the Heller Family's homes and businesses in Budapest and Sopron. All contents of the said properties including expensive artwork, gold, silver, furniture cash, jewelry, heirlooms, valuable collectibles, gold, silverware were stolen and confiscated.

60. The estimated value of the looted assets, including real and personal property which was stolen, confiscated and wrongfully taken by the Hungarian government from the Heller Family includes:

(a) $1,200,000 for inventory and assets of the businesses;

(b) $4,000,000 real estate value of the business and residence;

(c) $2,000,000 art, jewelry and antiques of the home;

(d) $1,000,000 trusts, bonds, securities and capital.

**E.  The Heller Family Escapes Death**

61. The Heller Family would have perished had they not fled to Nice, France in 1939, prior to the mass killings of Hungarian Jews.  They first tried to go to Switzerland but were denied entry.

62. Once in France, the Heller Family, travelled to the south of France to secure passage on the "Rex," an Italian liner and sailed transatlantic from Cannes to New York. [1]

63. Plaintiffs' parents told authorities that they were visiting the U.S. to participate in the World's Fair in New York that summer. On May 3, 1939, Plaintiffs, their parents and grandparents boarded the "Rex."

64. Plaintiffs arrived in New York sometime during May 1939.

65. On September 1, 1939, about three months after Plaintiffs arrived in New York, Hitler marched into Poland.

66. The Heller Family always intended to return to their affluent homes and successful businesses in Hungary.

67. Defendant's systematic killing of Jews and looting of all their properties and possessions made Plaintiffs' return to Hungary and the life they enjoyed there an impossibility and they remained in the U.S.

F. **The Thwarting of Plaintiffs' Ability to Bring These Claims**

68. Plaintiffs and their parents returned many times to Hungary after the War to reclaim their homes, businesses and possessions.

69. When they returned, they found that Hungarian citizens were living in their homes, operating their businesses and inventories, and using all of their possessions.

70. Plaintiffs tried to receive access to Defendant's records about their properties and were denied access.

71. Plaintiffs' attempts to claim their rightful ownership of all their properties have failed. The Defendant blocked access to municipal records. Plaintiffs did not receive any tangible

---

[1] See https://en.wikipedia.org/wiki/SS_Rex#World_War_II.

results for restitution and indemnification despite decades of legal attempts to do so within the framework of Hungarian law.

72.   Plaintiffs made many visits to their properties, hired legal counsel and filed claims, all of which did not compensate them for their losses.

73.   To make matters worse, the Hungarian government never regulated the Hungarian state's responsibility to indemnify Jews for losses suffered.

74.   The Paris Peace Treaty of February 10, 1947, for example, incorporated a number of provisions relating to the restoration of confiscated property.   Paragraph 1 of Article 27 stipulated that Hungary undertakes in all cases where the property, legal rights or interests in Hungary of persons under Hungarian jurisdiction have, since September 1, 1939 been the subject of measures of sequestration, confiscation or control on account of racial origin or religion of such persons, the said property, legal rights and interests shall be restored together with their accessories, or, if restoration is impossible, fair compensation shall be made thereof.

75.   These provisions, however, were merely declaratory, were not self-executing, and did not provide for sanctions in case of non- compliance, other than the implied possible litigation before an international tribunal.

76.   The Communist party rose to power in Hungary from 1922-1943; and again from 1944-1948.  During that time "the issue of compensation and restitution was squashed under the impact of the campaign against Zionism."

77.   In the 1950's the Commission for the Administration of Abandoned Properties became the Jewish Restoration Fund.  These funds were rarely used for the intended purpose. This fund was frequently raided by Communists to finance their own political projects.

78.     On April 7, 1992, two years after the downfall of the Communist regime, the Hungarian Parliament adopted a law providing compensation for material losses incurred between May 1, 1939 and June 8, 1949.  This was followed by the adoption of another law on May 12, 1992, providing compensation for those who, for political reasons, were illegally deprived of their lives or liberty between March 11, 1939 and October 23, 1989.  The remedies by these statues, however, were paltry and wholly inadequate.

79.     Defendant established a Resolution Tribunal in order to hear and ostensibly compensate victims for their losses.  Plaintiffs wrote letters and filed claims in August 20, 2004 and May 2005 and did not receive compensation for all losses articulated in this claim.

80.     Plaintiffs' many attempts to reclaim their property in the past seven decades failed because of Defendant's continued denials and blocks.


## VI.      THIS SUIT IS TIMELY FILED

81.     No limitation period should be imposed on the prosecution of this action, due to the heinous and unprecedented quality of the wrongdoing giving rise to this action, and for the same reasons that no limitations period is imposed on criminal prosecutions for the violations of international law, war crimes, genocidal takings and crimes against humanity alleged herein.  *See e.g.,* the Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N. GAOR, Supp.; No. 18, at 40, U.N. Doc. A/7218 (1968).

82.     Alternatively, the Complaint is timely filed under the continuing wrongdoing doctrine. Under this doctrine, the limitations period does not begin to run until the last wrongful act occurs.  Here, the Defendant's ongoing failure to return Plaintiffs' assets to them or

compensate them for the same, coupled with the Defendant's repeated denials of the facts and concealment of information relating thereto, which, had disclosures been made, would have enabled Plaintiffs to bring suit much earlier, constitute deliberate, continuous and ongoing violations of international and domestic law.  These violations continue to this day.

83.   Likewise, Defendant's failure and refusal to allow the Plaintiffs' and their attorneys access to official documentation maintained by Defendant evidences their depredations, as alleged above, coupled with information obtained during the course of this litigation that Defendant tried to destroy this documentation and archival evidence of their wrongdoing, constitutes a continuing wrong that is actionable.

84.   Alternatively, any statute of limitations is equally tolled.  Plaintiffs were kept ignorant of vital information necessary to pursue their claims without any fault or lack of due diligence on their part. Defendant continually thwarted any attempts to recover assets, as well as facts and information relating thereto.  The deceptive and unscrupulous deprivation of assets and information substantiating Plaintiffs' rights to these assets entitles them to the benefit of equitable tolling.

85.   Further, the Holocaust, World War II, and the subsequent diaspora of the Plaintiffs constitute extraordinary circumstances in and of themselves sufficient to invoke the doctrine of equitable tolling and to prejudice the operation of laches.  Plaintiffs suffered and continue to suffer debilitating trauma resulting from the looting of their homes, businesses, possessions and quality of lives they enjoyed prior to the war.  126. This disabled and deterred them from pursuing litigation against the Defendant.  Moreover, for most of the period between the end of World War II and the present, there was no apparent

forum in which Plaintiffs could bring their claims and safely, and fairly, have them adjudicated.

86.   Alternatively, the facts alleged above give rise to an estoppel.  Defendant continuously denied their participation in the unlawful conduct alleged herein.  Further, they have actively concealed information concerning Plaintiffs' assets; information that was in the Defendant's exclusive control.  Plaintiffs have thus been prevented from obtaining access to vital information necessary to bring the claims.  Defendants are thus estopped to rely on any statutes of limitations or the doctrine of laches as a defense to the claims herein.

87.   Defendant is estopped to raise limitations or latches as a defense for the further reason that they actively lulled Plaintiffs into allowing any otherwise applicable statute(s) of limitations to expire. Defendant did this through a series of legislative enactments and remedial statutes beginning with the Treaty of Paris in 1947 through laws adopted in the 1990's that held out the false promise of providing Plaintiffs with adequate compensation.

88.   Additionally, Defendant is estopped to raise any defense of laches due to their own manifestly unclean hands as alleged hereinabove.  The elements of laches cannot be met for further reason that Defendant benefitted, rather than suffered injury by virtue of any failure on the part of the Plaintiffs to bring this suit earlier.

## VII.   CAUSES OF ACTION

### COUNT I
### (EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW)

89.   Plaintiffs incorporate by reference all the allegations above.

90.   Under international law, a state is responsible for injury resulting from a taking by the state of the property of a national of another state that: (1) is not for a public purpose, or (2) is discriminatory, or (3) is not accompanied with just compensation.

91.   As alleged above, at the time of the taking of the Properties, the victims were effectively non-Hungarian citizens and were considered foreigners or stateless persons by Hungary.

92.   The taking of the Properties was not for a public purpose, it was discriminatory and it was not accompanied by just compensation.

93.   Accordingly, the taking of the Properties constituted an international expropriation by a state against a non-citizen, thus violating international law.

94.   Accordingly, Defendant is liable towards Plaintiffs for the expropriation of the Properties.

**COUNT II**
**(GENOCIDE IN VIOLATION OF THE LAW OF NATIONS)**

95.   Plaintiffs incorporate by reference all the allegations above.

96.   Customary international law defines genocide as any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:

    (i)  Killing members of a group;

    (ii) Causing serious bodily or mental harm to members of a group; [or]

    (iii) Deliberately inflicting on a group conditions of life calculated to bring about its physical destruction in whole or in part ...

97.   *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, §702 (1987). The offense of genocide under U.S. law uses the same definition. *See* 18 U.S.C. §1091(a) (defining the crime of genocide).

98.   The systematic and methodical expropriation of Jewish property with aim to eradicate and "purify" Hungary – coupled with the parallel attempt to physically destroy the Jewish nation – constitutes Genocide in violation of the law of nations.

99.  The taking of the Property by the Defendant was no different than the Nazis' mass plunder of Jewish property throughout Europe, the purpose of which was to further the regime's genocidal agenda.

100. Accordingly, Defendant Hungary is responsible for the genocidal taking of the Heller Properties.

101. Hungary never compensated Plaintiffs for the expropriation of the Properties.

102. Therefore, Hungary must compensate Plaintiffs for the genocidal taking of the Properties, including any benefits it reaped while the Properties were in its possession and ownership.

## COUNT III
### (CONVERSION)

103. Plaintiffs incorporate by reference all the allegations above.

(a) Plaintiffs, their parents and grandparents owned and had the right to possess the Properties that were taken from them by Defendant, as described hereinabove, and never returned it to them.

(b) Upon information and belief, Defendant Hungary stole the Real Properties and rented them out. The rents were taken by Defendant and were never returned to them. Plaintiffs were never compensated for the illegal misappropriation of the rental income from the Real Properties by the Defendant.

(c) Upon information and belief, Defendant Hungary ultimately sold the Real Properties and pocketed the proceeds of the sale. Plaintiffs were never compensated for the illegal misappropriation of the proceeds from the sale of Real Properties by the Defendant.

104. Defendant's actions were intentional and contrary to international law.

105. Defendant deprived Plaintiffs of such property, and the possession and use thereof.

106. Defendant's unlawful actions caused severe injury and damages to Plaintiffs.

## COUNT IV
## (UNJUST ENRICHMENT)

107.   Plaintiffs incorporate by reference all the allegations above.

    (a)  Plaintiffs were deprived of their Properties by direct actions of Defendant;

    (b)  Plaintiffs were deprived of the rentals of the Real Properties by Defendant's wrongful conduct, without consideration, compensation or legal cause.

    (c)  Plaintiffs were deprived of the proceeds of the sale of the Real Properties by Defendant's wrongful conduct, without consideration, compensation or legal cause.

108.   Defendant was enriched thereby.

109.   It would be inequitable and unconscionable for Defendant to continue to enjoy the benefits of possession and use of Plaintiffs' Properties, including the Real Properties, without compensating them therefor.

## COUNT V
## (RECKLESSNESS)

110.   Plaintiffs incorporate by reference all the allegations above.

111.   Defendant was reckless in their treatment of Defendant of Plaintiffs by looting Plaintiffs' properties and causing damage and loss to Plaintiffs and families.

## COUNT VI
## (NEGLIGENCE)

112.   Plaintiffs incorporate by reference all the allegations above.

113.   Defendant failed to use ordinary or reasonable care in order to avoid injury to Plaintiffs and their families during the war, resulting in the confiscation of Plaintiffs' properties.

114.   Defendant's negligence caused damage or loss to Plaintiffs.

## COUNT VII
## (CIVIL CONSPIRACY WITH NAZI GERMANY TO COMMIT TORTIOUS ACTS)

115.   Plaintiffs incorporate by reference all the allegations above.

116.   As early as October 1942, German Schutzstaffel ("SS") senior officers, including SS Hauptsturmfuhrer Dieter Wisiceny and SS Reichsfuhrer Heinrich Himmler ("Himmler") on behalf of the Nazi government of Germany, began conspiring and collaborating with Defendant on a plan to address the "Jewish Question" in Hungary.  The plan came to fruition following Nazi Germany's occupation of Hungary on March 19, 1944.  Miklos Horthy, Regent of Hungary, authorized Hungary's Prime Minister, Dome Sztojay, to enter into agreement with Nazi Germany respecting "resettlement" of Hungarian Jewry, including provision of Jewish slave labor to serve the Nazi war machine and implementation of the "Final Solution" *viz.,* the mass murder and eradication of Hungarian Jewry.  Sztojay did so on behalf of Hungary.

117.   The Nazi government, through Reich Main Security Office ("RSHA"), under the direction of Himmler as head of SS, with the full connivance and cooperation of Hungary placed SS Obersturmbannfuhrer Adolf Eichmann in charge of forced deportation of the Hungarian Jews from their homes, and their compelled transport to concentration camps throughout Nazi-occupied Europe.

118.   Germany, on the one hand, and Hungary, on the other, also conspired to, and did steal Hungarian Jews' property, including all of Plaintiffs' properties as described hereinabove, incident to, and during the Jews' forced removal from their homes, incarceration in ghettos and deportation to camps.  Plaintiffs were victimized, and suffered injury caused, by this conspiracy tortuously to deprive Plaintiffs of their rights to property and possession, acting recklessly towards them, aid and abet each other's criminal misconduct, steal and convert Plaintiffs' property and possessions, and unjustly enrich themselves at Plaintiffs' expense.

119.   Defendant's conspiracy with Nazi Germany caused grievous injury to Plaintiffs.

## COUNT VIII
### (AIDING AND ABETTING)

120.   Plaintiffs incorporate by reference all the allegations above.

121.   Defendant engaged in tortious conduct as set forth hereinabove, consisting of the conversion of Plaintiffs' personal property. Defendant aided and assisted Nazi Germany in their unlawful activities towards Plaintiffs, as alleged hereinabove. Defendant had knowledge of the wrongful misconduct of Nazi Germany and well understood the role in the unlawful conduct towards looting Plaintiffs' properties.

122.   Plaintiffs suffered severe damages caused by Defendant's unlawful conduct as alleged hereinabove.

## COUNT IX
### (ACCOUNTING)

123.   Plaintiffs incorporate by reference all the allegations above.

124.   Defendant never accounted for or paid the value of the Plaintiffs' property or the profits which the Defendant derived from those properties since the end of World War II.

125.   As a result of the Plaintiffs' property being taken as part of genocidal taking, against their will and without just payment by Defendant, Plaintiffs have been unable to use or invest those assets.

126.   As a result of the Defendant's wrongful acts, Plaintiffs have been damaged and demand an accounting of their stolen property, and the profits earned thereby by Defendants.

## COUNT IX
### (DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF)

127.   Plaintiffs incorporate by reference all the allegations above.

128. Defendants have maintained in their archives, in hard-copy, facsimile and digital form, documents that are both instruments that were employed in the unlawful acts and events described hereinabove relating to the isolation, ghettoization, enslavement and plundering of Hungarian Jewry and their deportation to German death camps, as well as evidence of acts and events, including inventories of stolen property. Plaintiffs and other Jewish victims have been consistently denied access to these records which are vital to the proof of this case.

129. News reports have indicated that Defendant intended to destroy the records.

130. Plaintiffs have the right to inspect and copy such records, particularly as they relate to the properties of their families.

131. Plaintiffs have suffered and absent appropriate equitable relief, will continue to suffer irreparable injury by being denied access to Defendant's referenced records. The irreparable injury will continue to occur both until the trial of this matter and thereafter.

132. Remedies available at law, such as monetary damages are inadequate to compensate for this injury.

133. Injunctive relief would not substantially harm Defendant. Hence, considering the balance of hardships between Plaintiffs, on the one hand, and Defendant, on the other, an equitable remedy is warranted.

134. The public interest would be furthered by injunctive relief commanding that Plaintiffs and counsel would have access to aforementioned documents.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of Plaintiffs against Defendant, as follows:

(a) Award Plaintiffs compensatory damages, and/or compensation for unjust enrichment, in an amount to be proven at trial, for the Defendant's unlawful conduct, as alleged hereinabove;

(b) Award Plaintiffs declaratory and injunctive relief;

(c) Order that the Defendant render an accounting to Plaintiffs as sought hereinabove;

(d) Award Plaintiffs pre-judgment and post-judgment interest;

(e) Award Plaintiffs the costs of this action, including attorney's fees and all reasonable expenses; and

(f) Grant such other and further relief as shall be deemed just and proper by the Court.

Date: July 30, 2021.

Respectfully submitted,

/s/ *Lawrence Marc Zell*

_____

Lawrence Marc Zell
(DC Bar # 959437)
**ZELL & ASSOCIATES**
**INTERNATIONAL ADVOCATES LLC**
1345 6th Ave.
New York, N.Y. 10105

34 Ben Yehuda St.
15th Floor
Jerusalem, Israel 9423001
E-mail: mzell@fandz.com

*Counsel for Plaintiffs*