**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STEVEN ANTHONY HELLER, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 21-cv-1739 (BAH) |
| | Chief Judge Beryl A. Howell |
| REPUBLIC OF HUNGARY, | |
| Defendant. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Steven and Charles Heller are brothers and Hungarian Holocaust survivors, who initiated this lawsuit seeking long-overdue compensation for their late parents' and grandparents' property unlawfully seized by Hungary in the course of the many atrocities surrounding Hungary's treatment of its Jewish residents before and during World War II.  Their entitlement to such compensation is clear as a matter of both morality and basic fairness, and the staggering magnitude of the atrocities committed by Hungary against hundreds of thousands of Jews during the Holocaust is beyond debate.  This Court, however, is faced only with a jurisdictional question: whether plaintiffs can successfully thread a subject-matter-jurisdiction needle through the layers of exceptions and exceptions-to-exceptions in the Foreign Sovereign Immunities Act ("FSIA") and pursue their claims in United States federal courts.  Under the statute, as interpreted by binding case law, they cannot.

## I.    BACKGROUND

"During World War II, Hungary actively collaborated with Nazi Germany, as a formal ally, in its plan to eradicate European Jewry.  Hungary facilitated the destruction of the vast majority of its own Jewish population at the hands of Germany."  Compl. ¶ 17, ECF No. 1.  In

the course of this broader plan to eradicate the Jewish people, Hungary stripped Hungarian Jews of their possessions, including cash, jewelry, heirlooms, art, valuable collectibles, gold and silver, real estate, and businesses, loaded them onto trains, and transported them in squalid conditions to concentration camps where most were murdered in gas chambers. *See id.* ¶¶ 6, 47, 56. These atrocities reached a fever pitch "near the end of the war in 1944, when the Nazis and Hungary, knowing that they had lost [the war], raced to complete the eradication of Jews and steal all their property before the Axis surrendered." *Id.* ¶ 6. In a span of under two months, "over 440,000 Hungarian Jews" were "exterminated between May 15 and July 9, 1944," after being transported in 147 trains bound to Auschwitz and other locations. *Id.* ¶ 44. Additionally, Hungarian public officials "went from one Jewish home to the next making detailed inventories of the property in the homes from which Jews fled," *id.* ¶ 57, which property Hungary then expropriated "and converted to cash through sales and other means," *id.* ¶ 58. Hungary today acknowledges that "the treatment of Hungarian Jews during the Holocaust was reprehensible." Hung.'s Mem. Supp. Mot. Dismiss Compl. ("Def.'s Mem.") at 8, ECF No. 9. Much more can be said about the plight of Hungarian Jewry during World War II, of course, but such exposition would extend beyond the scope necessary to resolve the instant motion.[1]

Plaintiffs are the sole heirs of the estates of their grandparents, Joseph and Helena Spitzer (the "Spitzers"), and parents, Gedeon and Elizabeth Heller (the "Hellers"). Compl. ¶ 11.

---

[1] In the course of over a decade of proceedings in a similar case, this Court and the D.C. Circuit have written at length about the grim factual background surrounding Hungary's treatment of its Jewish residents during World War II and the Holocaust. *See generally Simon v. Republic of Hungary* ("*Simon-2014*"), 37 F. Supp. 3d 381, 385–95 (D.D.C. 2014), *aff'd in part, rev'd in part*, 812 F.3d 127 (D.C. Cir. 2016); *Simon v. Republic of Hungary* ("*Simon I*"), 812 F.3d 127, 132–34 (D.C. Cir. 2016), *abrogated in part by Federal Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021); *Simon v. Republic of Hungary* ("*Simon-2017*"), 277 F. Supp. 3d 42, 47–49 (D.D.C. 2017), *rev'd*, 911 F.3d 1172 (D.C. Cir. 2018); *Simon v. Republic of Hungary* ("*Simon II*"), 911 F.3d 1172, 1175–76 (D.C. Cir. 2018), *vacated per curiam*, 141 S. Ct. 691 (2021); *Simon v. Republic of Hungary* ("*Simon-2020*"), 443 F. Supp. 3d 88, 92–94 (D.D.C. 2020), *remanded*, No. 20-7025, 2021 WL 6210710 (D.C. Cir. 2021); *Simon v. Republic of Hungary* ("*Simon-2021*"), No. 10-cv-1770 (BAH), 2021 WL 6196995, at *2–3 (D.D.C. Dec. 30, 2021), *appeals docketed*, Nos. 22-7010 & 22-7013 (D.C. Cir. Jan. 26, 2022).

Collectively, these six individuals, comprise the "Heller Family."  All six were born in Hungary, the last born being Steven, on September 1, 1938.  *Id.* ¶¶ 2, 15.  All were Jewish.  *See id.* ¶¶ 6, 18.[2]  Plaintiffs do not allege that any members of the Heller Family were nationals or citizens of any other country prior to or during World War II.  Before the War, the Spitzers and, to a lesser degree, the Hellers, were affluent members of Hungarian society.  The Spitzers—two of plaintiffs' grandparents—owned sizable real estate holdings in Sopron, Hungary, including a substantial collection of furnishings, household and decorative items, and Joseph Spitzer operated both a law practice and a "large wine company" with employees, inventory, and a robust array of relevant equipment.  Compl. ¶¶ 28–37.  The Hellers—plaintiffs' parents—owned a more modest but still considerable estate, including a business ("the finest retailer in Budapest of men's and women's clothing and custom tailoring"), a home in Budapest, and a safe full of fine jewelry and accessories.  *Id.* ¶¶ 38–43.  The Spitzers' and Hellers' assets (collectively, the "Properties") were among the properties expropriated by Hungary from Hungarian Jews during the Holocaust.  *See id.* ¶¶ 16, 26, 43, 100–02, 118.[3]

Members of the Heller Family "returned many times to Hungary after the War to reclaim their homes, businesses and possessions."  Compl. ¶ 68.  Those efforts were largely unsuccessful, however, because they found their properties being used and occupied by other Hungarian citizens, and generally encountered impediments to securing access to relevant

---

[2]     The Complaint nowhere expressly alleges that the Spitzers and Hellers were Jewish; this is stated explicitly for only the two named plaintiffs, Charles and Steven.  In context, however, the inference is obvious.  *See, e.g.*, Compl. ¶ 44 ("The Heller Family was spared the genocidal murder that most Hungarian Jews suffered."); *id.* ¶ 59 (describing "the Heller Family's homes and businesses" as "Jewish properties"); *id.* ¶ 61 ("The Heller Family would have perished had they not fled to Nice, France in 1939, prior to the mass killings of Hungarian Jews.").

[3]     The Complaint, from time to time, imprecisely refers to "Plaintiffs'" property or possessions and Hungary's expropriation thereof.  *See, e.g.*, Compl. ¶¶ 5, 16, 20, 105, 107, 111, 118, 121, 125.  Given that plaintiffs were young children at the time of the takings in question, the Court construes references to "Plaintiffs'" property as intending to refer to "the Heller Family's" property or, alternately, property in which plaintiffs now have an interest by virtue of their status as heirs to the Spitzer and Heller estates.

records about the Properties.  *Id.* ¶¶ 69–72.  Plaintiffs have, over time, found themselves unable to secure full compensation for the expropriations through various remedial measures and fora offered by treaty or Hungarian law.  *See id.* ¶¶ 71–80, 87.

Plaintiffs filed this action in the U.S. District Court for the District of Columbia on June 30, 2021, asserting, in ten counts, common law and international law claims for expropriation in violation of international law (Count I), genocide (Count II), conversion (Count III), unjust enrichment (Count IV), recklessness (Count V), negligence (Count VI), civil conspiracy with Nazi Germany to commit tortious acts (Count VII), aiding and abetting (Count VIII), accounting (Count IX), as well as a demand for a declaratory judgment and injunctive relief providing plaintiffs with access to various records (Count X).  *See* Compl. ¶¶ 89–134.[4]  To satisfy their burden of alleging facts sufficient to establish the requisite subject matter jurisdiction of this Court to hear these claims despite the immunity Hungary would ordinarily enjoy under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, plaintiffs contend that defendants are not immune from suit because of the FSIA's expropriation exception, *id.* § 1605(a)(3).  Compl. ¶¶ 24–27.  The expropriation exception permits suit in United States courts against a foreign sovereign or its agencies or instrumentalities to vindicate "rights in property taken in violation of international law" when an adequate commercial nexus is present between the United States and a defendant.  28 U.S.C. § 1605(a)(3).

---

[4]      As Hungary points out, the Complaint identifies the demand for declaratory judgment and injunctive relief as "Count IX" even though that number is already in use by the accounting count.  Def.'s Mem. at 2 n.2.  The Court will identify this count as "Count X."

Hungary filed the pending motion to dismiss on February 28, 2022. *See* Hung.'s Mot. Dismiss Compl. Because of Its Sovereign Immunity, ECF No. 9. Briefing on the motion to dismiss was completed in May 2022, and this motion is now ripe for resolution.[5]

## II. LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), and "have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto," *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 980 (D.C. Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff thus generally "bears the burden of invoking the court's subject matter jurisdiction." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

When a jurisdictional skirmish "present[s] a dispute over the factual basis of the court's subject matter jurisdiction," the court "must go beyond the pleadings and resolve" any dispute necessary to the disposition of the motion to dismiss. *Feldman v. FDIC*, 879 F.3d 347, 351

---

[5]     On March 7, 2022, plaintiffs filed a Motion to Stay Proceeding or, Alternatively, to Grant Extension to File Opposition to Motion to Dismiss ("Pls.' Mot. Stay"), ECF No. 10, seeking to stay briefing on Hungary's motion to dismiss pending resolution by the D.C. Circuit of cross-appeals in the related case, *Simon v. Republic of Hungary*, Nos. 22-7010 & 22-7013 (D.C. Cir. docketed Jan. 26, 2022). Plaintiffs argued that a stay was warranted because the pending *Simon* appeal implicates various issues related to the FSIA's expropriation exception, the resolution of which may be dispositive of the instant motion. Pls.' Mot. Stay at 2–4. Hungary opposed, arguing, *inter alia*, that the Circuit lacked appellate jurisdiction over the *Simon* plaintiffs' appeal. Hung.'s Mem. Opp'n Pls.' Mot. Stay Proceeding at 1–2, ECF No. 12. The Court denied plaintiffs' motion for stay but granted an extension of time to complete briefing. Min. Order (Mar. 10, 2022). Separately, the appealing plaintiffs in *Simon* filed an opposed motion for entry of partial final judgment, pursuant to Federal Rule of Civil Procedure 54(b), so that their interlocutory appeal may proceed before the Circuit. Dismissed Pls.' Mot. Entry Partial J. Under Rule 54(b) or, in the Alternative, Pls.' Mot. Certification Three Questions for Interlocutory Appeal Under 28 U.S.C. § 1292(b), *Simon v. Republic of Hungary*, No. 10-cv-1770 (BAH) (D.D.C. June 8, 2022), ECF No. 184. Concurrently with this Memorandum Opinion and Order, the Court is issuing a Memorandum and Order granting the *Simon* plaintiffs' Rule 54(b) request. *See* Mem. & Order Entering Partial Final J., *Simon*, No. 10-cv-1770 (BAH) (D.D.C. July 18, 2022), ECF No. 187.

(D.C. Cir. 2018) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  In such situations, the "court may properly consider allegations in the complaint and evidentiary material in the record," affording the plaintiff "the benefit of all reasonable inferences."  *Id.*; *see also Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) ("In considering a motion to dismiss for lack of subject matter jurisdiction, . . . we 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" (quoting *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005))).  Absent "evidentiary offering[s]," *Feldman*, 879 F.3d at 351, however, courts must seek jurisdictional assurance by accepting as true all undisputed "factual allegations in the complaint and constru[ing] the complaint liberally," and again "granting plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks and citation omitted).

The FSIA is a "comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.'"  *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983)).  The FSIA "provides, with specified exceptions, that a 'foreign state shall be immune from the jurisdiction of the courts of the United States.'"  *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017) (quoting 28 U.S.C. § 1604).  Under the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), "United States courts may exercise jurisdiction over a foreign sovereign in any case 'in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United

States by the foreign state.'" *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 712

(2021) (quoting 28 U.S.C. § 1605(a)(3)); *see also Helmerich & Payne*, 137 S. Ct. at 1316.

Notwithstanding the general burden borne by any plaintiff to establish the subject matter

jurisdiction of the chosen court, when a plaintiff invokes the FSIA's expropriation exception as

the basis for jurisdiction, "the defendant state 'bears the burden of proving that the plaintiff's

allegations do not bring its case within a statutory exception to immunity.'" *Belize Soc. Dev.*

*Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (quoting *Phoenix Consulting*, 216 F.3d

at 40).

## III.   DISCUSSION

The instant motion turns entirely on whether plaintiffs can invoke the FSIA's

expropriation exception to pierce Hungary's sovereign immunity in United States federal courts

even though plaintiffs unambiguously were Hungarian nationals prior to the wartime conduct at

issue in the Complaint.  This question has for the most part already been asked and answered in

the negative, requiring that Hungary's motion to dismiss be granted because of the "domestic

takings rule."  First, an overview of principles from recent cases concerning the domestic takings

rule is provided.  Second, those principles are applied to conclude that plaintiffs offer no facts or

argument that allows them to escape the domestic takings rule.  Finally, because the parties'

briefing also addresses a variety of alternative routes to dismissal, those topics are briefly

cataloged to provide a roadmap for later proceedings depending on any developments on appeal.

### A.    Domestic Takings Rule

Recent binding precedent from the Supreme Court has confirmed that the "domestic

takings rule" applies to the FSIA's expropriation exception.  As the Supreme Court indicated in

*Federal Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021), the exception does not reach

instances of a foreign sovereign wrongly expropriating property of its own citizens even when

the sovereign subjects such citizens to extreme, even genocidal, maltreatment.  In *Simon v. Republic of Hungary* ("*Simon-2021*"), No. 10-cv-1770 (BAH), 2021 WL 6196995 (D.D.C. Dec. 30, 2021), this Court applied *Philipp* to a scenario functionally equivalent to this case, concluding there that *Philipp* does not allow a plaintiff to escape the domestic takings rule by arguing that a sovereign's egregious conduct effectively "denationalized" or rendered stateless the plaintiff.

### 1. Philipp

The Supreme Court issued its opinion in *Federal Republic of Germany v. Philipp* on February 3, 2021.  141 S. Ct. 703.  The bulk of the Court's opinion was devoted to the first question presented in the *Philipp* petition for certiorari, namely, "whether a country's alleged taking of property from its own nationals falls within" the FSIA's expropriation exception.  *Id.* at 707–08.  In *Philipp*, the plaintiffs asserted that a Nazi leader, Hermann Goering, "employed a combination of political persecution and physical threats to coerce" German Jewish art dealers to sell a collection of relics to Prussia, of which Goering was Prime Minister, well under their actual value.  *Id.* at 708.  The *Philipp* plaintiffs argued to the Supreme Court that this purchase was *itself* an act of genocide.  *Id.* at 709.  Indeed, the D.C. Circuit panel in *Philipp* had determined that "the [expropriation] exception for property taken in violation of international law was satisfied because 'genocide perpetrated by a state even against its own nationals is a violation of international law.'"  *Philipp*, 141 S. Ct. at 709 (quoting *Philipp v. Federal Republic of Germany*, 894 F.3d 406, 410–11 (D.C. Cir. 2018) (quoting *Simon v. Republic of Hungary* ("*Simon I*"), 812 F.3d 127, 145 (D.C. Cir. 2016), *abrogated in part by Philipp*, 141 S. Ct. 703), *vacated*, *Philipp*, 141 S. Ct. 703).  In other words, the *Philipp* plaintiffs contended that the domestic takings rule did not apply to such a genocidal taking of property.

A unanimous Supreme Court disagreed, holding the domestic takings rule applicable. The Court first traced the historical origins of the domestic takings rule, starting with the premise that "a sovereign's taking of a foreigner's property, like any injury of a foreign national, implicate[s] the international legal system because it 'constituted an injury to the state of the alien's nationality.'" *Philipp*, 141 S. Ct. at 710 (citation omitted). "The domestic takings rule endured even as international law increasingly came to be seen as constraining how states interacted not just with other states but also with individuals, including their own citizens." *Id.* The result was a judicial "consensus that the expropriation exception's reference to 'violation of international law' does not cover expropriations of property belonging to a country's own nationals." *Id.* at 711 (quoting *Altmann*, 541 U.S. at 713 (Breyer, J., concurring)) (quotation marks omitted).

The *Philipp* plaintiffs had argued that "the forced sale of their ancestors' art constituted an act of genocide because the confiscation of property was one of the conditions the Third Reich inflicted on the Jewish population to bring about their destruction," but the Court declined to "decide whether the sale of the [German Jews'] property was an act of genocide, because the expropriation exception is best read as referencing the international law of expropriation rather than of human rights." *Philipp*, 141 S. Ct. at 711–12. The international law of expropriation at the time of the FSIA's enactment in 1976, the Court continued, clearly "retained the domestic takings rule." *Id.* at 712. Furthermore, the text of the expropriation exception "places repeated emphasis on property and property-related rights," an odd drafting choice if the exception were meant to "provide relief for atrocities such as the Holocaust." *Id.* Viewing the FSIA as a whole, the Court observed that plaintiffs' position would upend the FSIA's carefully cabined grants of

jurisdiction related to human rights violations by "transforming the expropriation exception into

an all-purpose jurisdictional hook for adjudicating human rights violations."  *Id.* at 713–14.

### 2. **Simon-2021**

This Court had occasion to consider the implications of *Philipp*'s explication of the

domestic takings rule in a case similar to the instant matter that also invokes the FSIA's

expropriation exception to assert claims against Hungary.  After the case journeyed between

courts over a decade, on remand this Court recently decided the fourth motion to dismiss in

*Simon v. Republic of Hungary* ("*Simon-2021*"), No. 10-cv-1770 (BAH), 2021 WL 6196995

(Dec. 30, 2021).  The *Simon* plaintiffs are an assortment of broadly described "Hungarian Jews"

(or their heirs) all of whom had personal property seized by Hungary and its state railroad in

conjunction with their forcible deportations from Hungary during the Holocaust.  *Id.* at *2–3.  As

relevant here, the Court granted in part the defendants' motion to dismiss on FSIA grounds and

accordingly dismissed with prejudice four plaintiffs who, based on the allegations in the

operative complaint, appeared to have been Hungarian nationals at the time of the expropriations

at issue.  *Id.* at *37.  The domestic takings rule precluded these plaintiffs from invoking the

FSIA's expropriation exception and thus defendants maintained their sovereign immunity from

suit by these plaintiffs.  *Id.*[6]

*Simon-2021* reached this conclusion as a natural consequence of *Philipp*, in which the

Supreme Court held that "the phrase 'rights in property taken in violation of international law,'

as used in the FSIA's expropriation exception, refers to violations of the international law of

expropriation and thereby incorporates the domestic takings rule."  *Simon-2021*, 2021 WL

---

[6]    *Simon-2021* dismissed one other plaintiff *without* prejudice because the "allegations and evidence
proffered" were "sufficiently ambiguous as to leave the Court unsure as to whether he can be reasonably inferred to
have been a national of Hungary or Czechoslovakia at the time of the expropriations at issue."  2021 WL 6196995,
at *37.

6196995, at *17 (quoting *Philipp*, 141 S. Ct. at 715).  Critically, as *Simon-2021* explained, "[t]his holding categorically rejected the D.C. Circuit's rule in *Simon I*, mirrored in the Circuit's *Philipp* opinion, 'that the exception for property taken in violation of international law' is satisfied by genocidal takings 'because "genocide perpetrated by a state even against its own nationals is a violation of international law."'"  *Id.* at *17 (quoting *Philipp*, 141 S. Ct. at 709).  As a result, *Philipp* "precludes reliance on the egregiousness or genocidal nature of expropriative conduct as a means to escape the limitation of the domestic takings rule," and forestalls any "argument that statelessness induced by genocidal conduct removes such conduct from the confines of the domestic takings rule."  *Id.* at *16.

### B.    Application

Plaintiffs Charles and Steven Heller were born in Budapest, Hungary, in 1936 and 1938, respectively.  Compl. ¶ 15.  Plaintiffs themselves were therefore young children during World War II and the Holocaust, but are also "the sole heirs of their grandparents Joseph and Helena Spitzer's estate and parents Gedeon and Elizabeth Heller's estate in Hungary."  *Id.* ¶ 11.  Accordingly, the relevant inquiry for purposes of the domestic takings rule is the nationality of plaintiffs' parents and their grandparents (collectively with plaintiffs, the "Heller Family").  Specifically, plaintiffs must show that the members of the Heller Family were "*not* [] Hungarian national[s] immediately prior to defendant['s] expropriation of their property or the commencement of other genocidal conduct."  *Simon-2021*, 2021 WL 6196995, at *19.

No party contests that the Heller Family members were all Hungarian nationals at least up until the time they all fled Hungary in 1939, first to Nice, France, and then to New York.  *See* Compl. ¶¶ 61–64.  All were born in Hungary.  *Id.* ¶¶ 2, 15.  All "had homes, places of businesses and possessions in Budapest and Sopron," Hungary.  *Id.*  Demonstrating the Heller Family's deep roots in Hungarian society, these properties and possessions were sizable indeed, including:

"a lucrative real-estate property," *id.* ¶ 29, various homes, a "large wine company," *id.* ¶ 34, copious valuable artworks, furnishings, and household accoutrements, *id.* ¶ 36, fine jewelry, *id.* ¶ 40, and "the finest retailer in Budapest of men's and women's clothing and custom tailoring," *id.* ¶ 41. Furthermore, even after fleeing, the Heller Family did not take steps to shed Hungarian citizenship. To the contrary, the "Heller Family always intended to return to their affluent homes and successful businesses in Hungary." *Id.* ¶ 66. Indeed, they attempted to do so, "return[ing] many times to Hungary after the War to reclaim their homes, businesses and possessions," *id.* ¶ 68, only to find that their homes, businesses, possessions, and relevant records had been usurped or plundered in the intervening years, *id.* ¶¶ 68–72.

Accordingly, after *Philipp*, the only plausible pathway for plaintiffs to invoke the FSIA's expropriation exception notwithstanding the domestic takings rule requires concluding: (1) that the "domestic takings rule does not apply to stateless persons because stateless persons are 'aliens,' that is they are not nationals of the expropriating state," Pls.' Mem. Opp'n Def.'s Mot. Dismiss ("Pls.' Opp'n") at 4, ECF No. 14; and (2) that plaintiffs and the Heller Family "were stateless as a matter of fact and law" at the time of the takings on account of Hungary's *de facto* gradual stripping away of all indicia of citizenship from its Jewish residents, *id.* at 8–9. Though tempting as an invitation to address historical wrongs, this approach must fail as it would result in an outcome inconsistent with *Philipp*.

Let there be no mistake: Hungary's treatment of its Jews leading up to and during the war was beyond unconscionable. Hungary acknowledges this reality. Def.'s Mem. at 8 ("[I]t cannot be denied that the treatment of Hungarian Jews during the Holocaust was reprehensible . . . ."). As plaintiffs describe:

> Hungary's "dejewification" process began as early as 1920, continuing through the enactment of the first three Anti-Jewish Laws in 1938, 1939 and 1941, and the

issuance of a host of confiscatory and denationalizing decrees from 1942 to 1943. The Hungarian racial program against the Jews between 1938 and 1943 was modeled on Germany's nefarious Nuremberg Laws. The Hungarian variant of the Nuremberg Laws defined "Jews" in racial terms, forbade intermarriage and sexual intercourse between Jews and non-Jews, and excluded Jews from full participation in various professions. The laws also barred employment of Jews in the civil service and restricted their opportunities in economic life.

Pls.' Opp'n at 12 (footnote omitted). Matters escalated further during the war:

Hungary's *de jure* de-Jewification program culminated in its *de facto* denationalization in 1944. That is when Hungary threw its Jewish inhabitants out of their homes, expropriated all of their movable and immovable property, forced them into ghettos, forcibly packed them like animals into cattle cars and shipped—that is, deported—them outside the borders of Hungary into the custody and control of another sovereign (Nazi Germany), knowing that these persons, whom Hungary now has the "chutzpa" to claim as its nationals, would be transported to Auschwitz and other concentration and death camps outside Hungary to be gassed and turned into smoke and ash.

*Id.* at 14. The gravity of this grotesque conduct cannot be overstated.

While plaintiffs were thankfully spared from the worst outcomes that befell hundreds of thousands of Hungarian Jews, Compl. ¶ 44, in the Complaint they nonetheless repeatedly describe the takings they suffered as "genocidal" in character, *see, e.g.*, *id.* ¶¶ 5, 8, 43, 81, 96–100, 125. Plaintiffs also use the term "thefticide" to describe Hungary's systematic seizure of Jewish properties including the Heller Family's. *Id.* ¶¶ 57–60. The D.C. Circuit has endorsed this type of characterization, noting in *Simon I* that in its view, "the alleged takings did more than effectuate genocide or serve as a means of carrying out genocide. Rather, we see the expropriations *as themselves genocide*." 812 F.3d at 142 (emphasis in original) (citation omitted).

Whatever the merits of plaintiffs' argument that the domestic takings rule does not, as a general matter, reach claims by stateless persons, this Court explained in *Simon-2021*, that *Philipp* "precludes reliance on the egregiousness or genocidal nature of expropriative conduct as a means to escape the limitation of the domestic takings rule. *Philipp* is also irreconcilable with

plaintiffs' argument that statelessness induced by genocidal conduct removes such conduct from the confines of the domestic takings rule." *Simon-2021*, 2021 WL 6196995, at *16.

Not only is the purportedly denationalizing conduct on which plaintiffs rely in this case essentially the same conduct as that which the *Simon* plaintiffs invoked, but the two sets of plaintiffs use nearly identical descriptions of that conduct. *Compare* Pls.' Opp'n at 14, *with* Pls.' Mem. Opp'n Fourth Mot. Dismiss at 29, *Simon*, No. 10-cv-1770, ECF No. 167. Plaintiffs here offer no coherent reason why the Court should stray from its analysis in *Simon-2021* in holding that these "expropriations conducted as an integral part of a broad genocidal program—which the Holocaust unquestionably was—simply cannot trigger the expropriation exception with respect to takings from individuals regarded as citizens of the expropriating state during or just prior to the genocidal events." 2021 WL 6196995, at *18.

In fact, plaintiffs barely engage with this critical holding in *Simon-2021* at all, relegating the matter to a single, confusing footnote in which they do not attack the Court's reasoning as incorrect, but rather attempt to manufacture a distinction, stating "Plaintiffs here do not argue that the domestic takings rule is inapplicable because of the genocidal nature of the takings. Rather, Plaintiffs' focus is strictly limited to the question of their nationality." Pls.' Opp'n at 15 n.16. As an initial matter, while plaintiffs now try to distance themselves from reliance on the "genocidal takings" argument given its FSIA consequences after *Philipp*, the Complaint is not so circumspect: "*The systematic and methodical expropriation* of Jewish property with aim to eradicate and 'purify' Hungary—coupled with the parallel attempt to physically destroy the Jewish nation—*constitutes Genocide* in violation of the law of nations." Compl. ¶ 98 (emphasis added).

Further, by "strictly limit[ing]" their focus "to the question of their nationality," Pls.'

Opp'n at 15 n.16, plaintiffs attempt to stand on a wobbly, hypertechnical stepping stone between

the conduct—a "program of genocidal conduct of which expropriations are a part," *Simon-2021*,

2021 WL 6196995, at *18—and the result demanded by *Philipp* that such conduct against a

state's own nationals cannot escape the domestic takings rule.  "That is precisely what *Philipp*

forecloses, only without articulating the intermediate 'loss of nationality' step" on which

plaintiffs here rely.  *Simon-2021*, 2021 WL 6196995, at *18.  Plaintiffs insist that this case turns

only on "whether Hungary's *deJewification* and denationalization legislation, decrees and

execution thereof"—and *not* genocidal conduct per se—"severed the genuine link between

Trianon Jewry and the Hungarian state, thereby rendering Plaintiffs stateless aliens outside the

domestic takings rule."  Pls.' Opp'n at 15 n.16 (emphasis in original).  This conceptual

compartmentalization, however, is difficult to square with plaintiff's own description of the "*de*

*jure* de-Jewification program culminat[ing] in its *de facto* denationalization in 1944," when

Hungary deported Jewish residents, expropriated their property, and routed them to Auschwitz

and elsewhere.  Pls.' Opp'n at 14.

To be sure, during this time period Hungarian Jews were so badly mistreated as to

deprive them of essentially all the ordinary appurtenances of Hungarian citizenship.  The parties

dispute whether that rendered them "stateless" or not.  *Compare* Pls.' Opp'n at 42 ("They were

stateless aliens, rendered so by Hungary's own de-Jewification program."), *with* Hung.'s Reply

Mem. Further Supp. Mot. Dismiss Compl. ("Def.'s Reply") at 3 n.6, ECF No. 16 ("Hungary

does not concede that these Plaintiffs were, in fact, rendered stateless by Hungary.").[7]  This

---

[7]    As Hungary points out, "unlike Germany, Hungary never revoked the citizenship of Hungarian Jews."
Def.'s Reply at 3 n.6; *see also Simon-2021*, 2021 WL 6196995, at *17.  As a practical matter, however, this
distinction likely mattered little to the Hungarian or German victims.

difficult question, along with the antecedent question whether expropriations from stateless persons fall within the domestic takings rule, however, need not be answered because *Philipp*, as interpreted in *Simon-2021*, demands that the FSIA's expropriation exception cannot reach expropriations carried out against even badly treated citizens *regardless* of what labels might be applied to aspects of a defendant's genocidal conduct.[8]  Plaintiffs' argument to the contrary attempts to nullify any practical effect of *Philipp*'s holding, as indicated in a revealing parenthetical describing a law review article on which plaintiffs rely: "criticizing the 'genocide takings' doctrine announced in *Simon I* and ultimately abrogated in *Philipp* and observing that the result can be achieved within the language and structure of the FSIA under existing case law, using the concept of 'substantive citizenship' to address the nationality issue."  Pls.' Opp'n at 11–12.  Supreme Court case law, however, does not work that way.  If binding precedent dictates that under a particular set of circumstances a set of expropriative actions remains covered by foreign sovereign immunity, a plaintiff cannot "achieve[]" the same "result" simply by reframing the conduct at issue in different terms.

\*   \*   \*

Plaintiffs understandably view this result as unfair, and express as much with impressive rhetorical flourish: "Like the parricidal orphaned murderer in Leo Rosten's classic definition of

---

[8]    Plaintiffs cite to *de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113 (D.D.C. 2011), *aff'd in part, rev'd in part*, 714 F.3d 591 (D.C. Cir. 2013), as collecting contrary authority indicating that "a member of a minority group who was not entitled to full civic and political rights at the time of the property expropriation is not considered a national of the expropriating sovereign for purposes of the 'domestic takings' rule."  Pls.' Opp'n at 8–9.  *de Csepel*, however, is not binding on this Court, and more importantly, long predates *Philipp*.  For the same reasons, *Comparelli v. Republica Bolivariana de Venezuela*, 891 F.3d 1311 (11th Cir. 2018), cited by plaintiffs for the proposition that "U.S. court considers all relevant facts and circumstances in determining nationality for purposes of the domestic takings rule," Pls.' Opp'n at 10, is inapposite both because it predates *Philipp* and also because it examines the circumstances under which a resident *acquires* nationality as opposed to losing it, *see Comparelli*, 891 F.3d at 1321–24.  Finally, *Ambar v. Federal Republic of Germany*, No. 20-cv-3587, 2022 WL 782388 (D.D.C. Mar. 15, 2022), is unhelpful to plaintiffs because *Ambar* considered the domestic takings rule in the context of a victim whom Germany expressly denationalized by decree in 1941, *id.* at *5.

'chutzpa,' Hungary now asks this Court to cloak it with immunity based on the belated and audacious claim that Plaintiffs and their predecessors were Hungarian nationals at the time their erstwhile *patria* despoiled their home, assets, and businesses, just so that it can escape liability for purloining, hoarding and liquidating Plaintiffs' property with impunity." Pls.' Opp'n at 9 (footnote omitted). That description, however, overstates the reach of the holding in *Philipp*, *Simon-2021*, and now in this case. The FSIA forecloses, only, the use of *United States federal courts* as fora in which recourse can be found for historical expropriations of property by a foreign state from persons who were at the time, at least nominally, nationals of such state. This result does not interfere with plaintiffs' ability to seek compensation through other fora or mechanisms more closely associated with the conduct at issue. The Court appreciates the difficulties plaintiffs say they have encountered availing themselves of alternate sources of remedies, *see* Compl. ¶¶ 8, 73–80, but any inadequacy of foreign remedies cannot overcome statutory limitations on the subject matter jurisdiction of United States courts. Finally, the boundaries placed on the FSIA's exceptions, whatever one's opinion, reflect the considered judgment of Congress and this Court is in no position to upset that policy decision.

### C.    Other Arguments

The parties devote substantial briefing to sundry other issues that need not be decided because *Simon-2021*'s logic is dispositive of the instant motion, but for completeness those issues are cataloged here.

*FSIA Commercial Nexus Requirement*. The FSIA's expropriation exception requires not only that "rights in property taken in violation of international law are in issue," but also that a nexus exists between the property in question and commercial activities currently undertaken by the foreign sovereign defendant in the United States. 28 U.S.C. § 1605(a)(3). The parties dispute whether this requirement is satisfied, *see* Def.'s Mem. at 9–18; Pls.' Opp'n at 15–28,

though both recognize that this Court has previously analyzed the matter under at least somewhat overlapping facts and concluded that the commercial nexus requirement is met as to Hungary, *see* Def.'s Mem. at 16 n.8; Pls.' Opp'n at 16 n.18; *Simon v. Republic of Hungary* ("*Simon-2020*"), 443 F. Supp. 3d 88, 101–11 (D.D.C. 2020).  In any case, given that the domestic takings rule alone suffices to grant the instant motion, this fact-specific inquiry need not be conducted here.

> *Non-Property Counts*.  Hungary observes that several claims brought in the Complaint "do not involve property claims," such as Counts II (Genocide in Violation of the Law of Nations), VII (Civil Conspiracy with Nazi Germany to Commit Tortious Acts), VIII (Aiding and Abetting), and X (Declaratory Judgment and Injunctive Relief).  Def.'s Mem. at 19; Def.'s Reply at 11 n.19.  Plaintiffs offer only a terse rejoinder.  *See* Pls.' Opp'n at 28 n.29.  The answer is ultimately of no consequence.  If these claims are properly considered as putting property "in issue," the conclusion that the domestic takings rule prevents the use of the FSIA's expropriation exception, *see* Part III.B, *supra*, applies equally to these putative property claims.  If, on the other hand, these are not properly viewed as property claims at all, plaintiff fails to identify any *other* FSIA exception that would defeat Hungary's default entitlement to sovereign immunity.  *See* 28 U.S.C. § 1605(a) (listing exceptions, none of which apply in this case).

> *Substantive Cause of Action*.  Hungary notes that the FSIA's expropriation exception is only an exception to a broad grant of immunity and does not, itself, create a substantive cause of action.  Def.'s Mem. at 20–21.  Hungary then advances the novel argument that because plaintiffs do not allege any wrongdoing that took place in the United States, "no state or federal common law exists that could provide a cause of action to govern Plaintiffs' claims," nor do any statutory causes of action apply here.  *Id.*  In response, plaintiffs argue, *inter alia*, that under

choice-of-law principles, *Hungarian* substantive law governs plaintiffs' claims.  Pls.' Opp'n at 41 n.38.  This debate, while interesting, is misplaced in the instant motion for dismissal based on sovereign immunity—an issue of subject matter jurisdiction.  No motion is pending under Federal Rule of Civil Procedure 12(b)(6), in which this inquiry might be appropriate were subject matter jurisdiction to be established.

*International Comity*.  Hungary revisits the proposition that "international comity allows district courts, in their sound discretion, to decline to exercise jurisdiction in exceptional cases when a dispute can more appropriately be resolved by a foreign sovereign."  Def.'s Mem. at 21; *see also id.* at 21–25.  Under the law of this Circuit as articulated in *Simon II*, however, district courts cannot exercise their discretion in that manner or require "prudential exhaustion" of available foreign venues.  *See Simon v. Republic of Hungary* ("*Simon II*"), 911 F.3d 1172, 1180– 81 (D.C. Cir. 2018) (rejecting the premise of international comity-based abstention or prudential exhaustion), *vacated on other grounds*, 141 S. Ct. 691 (2021).  Despite the vacatur of *Simon II* for other reasons, its holding in this respect remains binding law and has since been reaffirmed by the Circuit.  *See Simon-2021*, 2021 WL 6196995, at *33–36 (explaining the continuing precedential effect of *Simon II*); *de Csepel v. Republic of Hungary*, 27 F.4th 736, 753 (D.C. Cir. 2022) (expressly "reaffirm[ing] our holdings and rationales in *Simon* [*II*]" after noting that "[a]s a formal matter" the vacatur of *Simon II* had "reopen[ed] the issue" of prudential exhaustion).  Accordingly, Hungary's argument for dismissal on this basis fails.

*Forum Non Conveniens*.  Finally, Hungary reprises an argument pushed vigorously in the *Simon* litigation, arguing here that the Court should decline to exercise jurisdiction over this case under the doctrine of *forum non conveniens* because, in a nutshell, the allegations all involve conduct by Hungary, in Hungary, against Hungarian nationals.  *See* Def.'s Mem. at 25–35.

Again, the Circuit rejected that argument in *Simon II*, *see* 911 F.3d at 1181–90.  Here, plaintiffs

insist variously that (1) the *Simon II* decision "remains the law in this Circuit," Pls.' Opp'n at 29;

(2) "Hungary is collaterally estopped from relitigating" its *forum non conveniens* defense having

already done so unsuccessfully in *Simon*, *id.* at 4 n.5; and (3) in any event, dismissal for *forum*

*non conveniens* is unwarranted on the merits, *id.* at 30–44.  The *forum non conveniens* holding,

however, is better described as law of the *case* in *Simon* as opposed to law of the *Circuit*, since

as Hungary correctly observes, "determinations of *forum non conveniens* are fact specific, and

can vary from case to case."  Def.'s Reply at 13.  Plaintiffs' collateral estoppel argument is

suspect for the same reason.  A reexamination of the merits of *forum non conveniens* could

therefore be proper, but the Court declines to undertake that project here given the simpler

alternative grounds for dismissal based on the domestic takings rule.

IV.    **ORDER**

    For the foregoing reasons, it is hereby

    **ORDERED** that Hungary's Motion to Dismiss the Complaint Because of Its Sovereign

Immunity, ECF No. 9, is **GRANTED**; it is further

    **ORDERED** that judgment is entered in favor of Hungary; and it is further

    **ORDERED** that the Clerk of Court shall close this case.

    **SO ORDERED.**

    Date: July 18, 2022

    *This is a final and appealable order.*

_____
BERYL A. HOWELL
Chief Judge

20